Backhaus vs. Sleeper, Garnishee, etc.

BACKHAUS, Appellant, vs. SLEEPER, Garnishee, etc., Respondent.

*March 23 — April 6, 1886.*

*Voluntary assignment: Fraud: Preferences.*

Where an insolvent debtor, within sixty days prior to making an assignment, and in contemplation thereof or of his insolvency, gives mortgages or other securities upon pre-existing debts, to creditors then having a reasonable cause to believe him insolvent, and then makes such assignment to one of such secured creditors, and therein recognizes such mortgages and other securities as valid, subsisting liens, the assignment must be regarded as made with the intention of giving a preference to such creditors and thereby to hinder, delay, and defraud general creditors, especially when some of such secured claims, and others in the list of creditors, are wholly or in part fictitious, and the assignment is made with the confessed purpose of forcing a compromise with creditors. Laws of 1883, ch. 349, sec. 2.

APPEAL from the Circuit Court for *Jefferson* County.

Garnishment. The following statement of the case was prepared by Mr. Justice CASSODAY:

Joseph Bursinger owned a brewery and other property in Watertown. October 6, 1883, he gave to the Wisconsin National Bank, of that place, a chattel mortgage on personal property described, to secure three notes: one being a note payable to Magdalena Drechael or order, for $1,000, dated June 9, 1881, due June 12, 1883, with interest at eight per cent., with warrant of attorney to enter judgment at date of mortgage; one note being payable to Watertown Elevator Company (Sleeper Bros.), or order, for $3,000, dated August 21, 1883, due three months after date, with interest at eight per cent.; the other note being a judgment note, payable to said bank or order, for $3,384.20, dated October 6, 1883, due one day after date, with interest at eight per cent.; making the principal sum thereby secured $7,384.20,— but which mortgage was not filed until Octo-

ber 29, 1883. Judgment was entered on said note of $1,000, and said note of $3,384.20, October 31, 1883. October 15, 1883, Joseph Bursinger and wife conveyed three lots to his son-in-law, Fred. C. Werner, for $400. October 16, 1883, Joseph Bursinger and wife gave a mortgage on real estate described to his son-in-law, Fred. C. Werner, to secure the payment of three notes of even date, amounting to the sum of $12,012.23. October 29, 1883, Joseph Bursinger gave to his son-in-law, Fred. C. Werner, and his book-keeper, Fred. Hoeper, a chattel mortgage on property described, to secure the payment of two notes executed by him on that day, and each with interest at seven per cent., and due January 29, 1884, one for $3,486, to said Werner, and one for $6,240, to said Hoeper, making the amount. thereby secured $9,726. November 5, 1883, Joseph Bursinger gave to said Hoeper a judgment note for $6,240, due on demand, and upon which judgment was entered on the same day for $6,245, upon which execution was issued and levied on the brewery on that day; also a judgment note to said Werner for $3,486, due on demand, upon which judgment was entered on the same day for $3,491, upon which execution was issued and levied on the brewery on that day. November 5, 1883, Joseph Bursinger gave to Otto Auers a judgment note for $1,507.50, due one day after date, upon which judgment was entered on that day for $1,523.

November 5, 1883, Joseph Bursinger made a general assignment to the defendant, *Jonas H. Sleeper*, and his successors in trust, in effect, of all and singular his property and effects of every kind and description, real, personal, and mixed (except such as was exempt), "the same being more fully and particularly enumerated and described in an inventory under the oath of said" assignor, to be filed by him, "in the office of the clerk of the circuit court of" Jefferson county, "within ten days after the execution of" said

assignment. The assignment was executed on the day named, with two witnesses, of whom F. Hoeper was one; and on the same day the assignee accepted the same, and gave a bond, with two sureties, in the penal sum of $26,000, with that amount verified by said assignor and Hoeper as "the whole amount of the nominal value of the assets," and which bond was at the same time approved by the commissioner. November 14, 1883, there was filed with said clerk an inventory of the property and assets of said Joseph Bursinger, and a list of his creditors, verified and certified to be correct by said assignor and assignee, from which it appeared that his total indebtedness was $112,047.82. This included $2,900 to his son, Ferdinand; $13,486 to his son-in-law, Werner; $7,700 to his book-keeper, Hoeper; also an inventory of personal property claimed to be exempt; also an inventory of personal property valued at $9,455.30, incumbered by the chattel mortgage executed October 6, 1883, to the bank, for $7,385.20, with interest, which in the recapitulation was deducted from the property covered by the mortgage, leaving, as there said, "assignor's interest, $2,010.20;" also an inventory of personal property, valued at $12,000, incumbered by chattel mortgage executed October 29, 1883, to Werner and Hoeper, for $9,755, with interest, which in the recapitulation was deducted from the property covered by the mortgage, leaving, as there said, "assignor's interest, $2,246.40;" also an inventory of real property not exempt, valued at $40,000, incumbered by mortgages, one to Stricknor for $14,000, and one to Ahrenberg for $3,000, amounting to $17,630, which in the recapitulation was deducted from the value of the property covered by the two last-named mortgages, leaving in said real estate, as there said, "assignor's interest, $22,370;" also an inventory of real estate not exempt, valued at $1,350, incumbered by mortgage to Fuchs for $1,200, with interest, which in the recapitulation was deducted from the value of

the property covered by that mortgage, leaving therein, as there said, "assignor's interest, $108;" also an inventory of book-account, amounting to the nominal sum of $3,541.28, making the assignor's interest in the property not exempt, after deducting from its value the amount of the several mortgages as aforesaid, and as there said: "Total net valuation of assets, $30,275.80."

The above facts appear in the record, and are undisputed. Other facts appear which are noticed in the opinion of the court.

The trial court found, among other things, in effect, that the assignment was filed in the clerk's office November 6, 1883, and that on the same day the "assignee took possession of the property so assigned," under and by virtue of the assignment; that the inventory of assets and lists of creditors were duly verified, certified, and filed; that all the property of the assignor omitted from the inventory was so omitted by mistake, and that all errors therein, if any, were by mistake; that any creditor omitted, and all errors in the list, were by mistake; that the assignment was made in good faith, and with no intent to hinder, delay, or defraud creditors; that the garnishee summons was served on the defendant, *Jonas H. Sleeper*, November 28, 1883; that all the property of the assignor he then held was under and by virtue of said assignment; and that he was not then indebted to the assignor, and had none of the property in his possession or under his control.

As conclusions of law, the court found, in effect, that the assignment was valid; that the assignee held the property assigned in trust for the benefit of the assignor's creditors; that the plaintiff had no cause of action against the defendant as garnishee; that the latter was entitled to judgment against the former for his costs and disbursements, and the same was ordered accordingly. From the judgment entered accordingly the plaintiff appeals.

For the appellant there was a brief by *Frisby, Gilson & Frisby,* and oral argument by *Mr. Gilson* and *Mr. L. F. Frisby.*

For the respondent there were briefs by *Hall & Skinner,* and oral argument by *Mr. Hall.*

CASSODAY, J. The plaintiff was a creditor of the assignor. The amount of his claim was nearly $4,000, due on express contract. He commenced this action at the time named against the assignor, and also the assignee as garnishee. The garnishee answered the assignment, and claimed the assignor's property under it. The liability of the garnishee depends entirely upon the validity of that assignment. Such validity is the only question here involved. Undoubtedly the assignee must be considered in a position to represent the rights and interests of creditors as against all transfers and conveyances fraudulent or void as to them. Ch. 170, Laws of 1882; *Batten v. Smith,* 62 Wis. 97, 98. He had the right to bring and maintain actions to avoid such fraudulent conveyances and transfers the same as creditors formerly could have done. *Ibid.* These things are, in effect, re-enacted in sec. 2, ch. 349, Laws of 1883. By that act every execution levy under judgment confessed or entered upon judgment note, and every sale, mortgage, hypothecation, lien, or other security made, given, or executed by an insolvent debtor, within sixty days prior to the making of any such assignment, and in contemplation thereof, or of insolvency, is void and of no effect, in case the person benefited thereby, or receiving such mortgage, pledge, lien, or other security, knew or had reasonable cause to believe, such debtor insolvent.

True, as this court has heretofore indicated, the manifest purpose of these enactments was to uphold general assignments, and to prevent all preferences (except for labor) through the active agency of the debtor, either by direct

or indirect methods, at any time during the sixty days immediately preceding the assignment. Where, during such time, illegal preferences have been given, instead of having the effect of avoiding an honest assignment without preference, executed according to the statutes, they may themselves be invalidated by the assignee under the assignment. In such a case, it may well be said that instead of the assignment being made with the intent to defraud creditors, it is made by a repentant debtor to obviate the consummation of his own frauds as against most of his own creditors, and to secure an equal distribution of all his property, including such as he had illegally mortgaged, pledged, etc., among all his creditors. Such liberal construction of the statutes is indulged, however, for the very purpose of securing such equal distribution among all the creditors of the insolvent debtor. Such equality is equitable and just. But such rule of construction is wholly inapplicable whenever it is manifest, from the whole transaction, that one of the purposes of making the assignment was to prevent such equal distribution and secure such illegal preference. It was to prevent such illegal preferences that the statute was enacted. Ch. 349, Laws of 1883; *Lang v. Simmons,* 64 Wis. 525. So, where an assignment is made with the intent to hinder, delay, or defraud creditors, it is null and void as to the persons thereby aggrieved. *Vernon v. Upson,* 60 Wis. 418; *Willis v. Bremner,* 60 Wis. 622; *Gere v. Murray,* 6 Minn. 305.

Does this assignment " contain or give any preference to one creditor over another creditor," within the meaning of the statute? Was it made with the intent to hinder, delay, or defraud any of the creditors of the assignor? The chattel mortgage of October 6, 1883, for $7,384.20, was given only thirty days prior to the assignment. That the assignor was then insolvent there can be no reasonable doubt. That he was then in contemplation of making such assignment,

or, at least, of such insolvency, seems to be certain. The claims covered by that mortgage were also secured by warehouse receipts for 4,000 bushels of barley. Warrants of attorney to enter judgment were given with two of the notes at the time of making the mortgage. Did the parties receiving such warrants of attorneys, warehouse receipts, or the mortgage, or the persons to be benefited thereby, have reasonable cause to believe the debtor to be then insolvent? The $1,000 note covered by the mortgage had been unsecured for more than two years, and was then nearly four months past due. The $3,000 note to *Sleeper's* firm had run for about six weeks without security, and had six weeks more to run before becoming due. The mortgage was not filed until October 29, 1883, and the judgments were not entered upon those notes and warrants of attorney until October 31, 1883. These facts were necessarily known to all the parties benefited by the mortgage. October 16, 1883, the notes and mortgage to the son-in-law of $12,000 on real estate were given. They are said to have been given in lieu of two notes of $3,000 each, given to the daughter at the time of her marriage two or three years before. No other consideration is claimed for those notes and that mortgage, and they are not mentioned in the list of creditors. October 29, 1883, the day on which the above chattel mortgage was filed, another chattel mortgage of $9,726 was given by the assignor to secure a note then given to the same son-in-law for $3,486, and another note then given to his book-keeper, Hoeper, for $6,240. That was done just a week before the execution of the assignment in question, and two days before judgments were entered upon two of the notes covered by the chattel mortgage to the bank.

About the time of executing the second chattel mortgage, and of filing both chattel mortgages, according to the testimony of the assignor, completed papers for an assignment

were drawn by Mr. Gardner, an attorney at Watertown. But they were never executed, because the assignor could not then get any one to act as assignee. The precise time when Mr. Gardner drew that assignment does not appear. The assignor testified that it was several days before the assignment in question,— might have been three, four, or five days; he could not tell exactly. It appears that Mr. Gardner witnessed the chattel mortgage executed and filed October 29, 1883. From the facts stated, and other testimony in the record, and what subsequently occurred, we think it may be fairly inferred that Mr. Gardner drew that mortgage at or about the same time he drew the papers for the assignment, and with the view of their speedy execution. The singular coincidence that the chattel mortgage drawn more than three weeks before, was filed on the same day as the second chattel mortgage, and followed two days afterwards by judgments being entered upon two of the notes covered by it, indicate a concert of action between the parties to be benefited by the securities and with reference to the assignment. This is strengthened by what subsequently occurred. The assignment in question was drawn by Mr. Mulberger, who witnessed, and probably drew, the mortgage to the bank, of October 6, 1883. He was interested in the bank claim, and was himself a creditor through the bank. He was attorney for two of the parties who had filed liens. He was requested to draw the assignment by *Mr. Sleeper*, the assignee. *Mr. Sleeper* was requested to act as such assignee some days previous to the assignment by Mr. Miller, who was interested in and represented the bank, and was a witness to the chattel mortgage given to the bank. That mortgage covered and secured a $3,000 note to the assignee, *Sleeper*, and his brother. There were present at the time Mr. Mulberger drew the assignment, on the evening of November 5, 1883, the assignor, the assignee, Dr. Werner, and Mr. Hoeper,— all, unless it was the as-

signor, pecuniarily interested in preserving the securities and liens obtained by virtue of the mortgages and judgments. Those parties fixed the amount of the bond on the assumption that the assignee was only to take and account for what might be left after the mortgages were all satisfied out of the mortgaged property. In so doing, Mr. Mulberger testified that he merely acted as their clerk. The assignor, according to his testimony, seemingly acquiesced in whatever was suggested, and signed whatever papers were requested, regardless of their significance. It is upon this theory that he attempts to account for his affidavit to the effect that the nominal amount of assets mentioned and referred to in the assignee's bond, and embraced in the assignment, was $26,000, after having sworn that the brewery itself was worth from seventy to seventy-five thousand dollars. One of the chattel mortgagees, Hoeper, joined with him in making the affidavit, and also witnessed the assignment.

Prior to the execution of the assignment, but on the same day, Charles R. Feld, as attorney for said Werner, Hoeper, and Auers, entered up three judgments in their favor, respectively, and against said assignor, on three judgment notes given on that day, aggregating $11,254. On the two of said judgments in favor of Werner and Hoeper, respectively, aggregating $9,731, executions were issued by said Feld as such attorney, and delivered to the sheriff about 5 o'clock in the afternoon of that same day; and about 9 o'clock of that same evening the sheriff levied the same upon the lands of the assignor not exempt. Just about the time such levy was being made, said Charles R. Feld acted as circuit court commissioner in the execution of the assignment, and the acceptance, certification, and approval of the bond.

Thus it appears that the active agencies in counseling and inducing the assignor to make the assignment were those

for whose benefit he had, within sixty days prior thereto, given mortgages, judgment notes, and collateral securities. These things can only be reconciled on the theory that the participants had not, in fact, learned of the enactment of ch. 349, Laws of 1883. Under that act, and upon the assignment being completed, it at once became the imperative duty of the assignee to commence actions to set aside any and all mortgages, liens, and securities made, given, or executed by the debtor within sixty days prior to the making of the assignment in contravention of that act. We are not aware of any more subtle method of attempting, in advance, to prevent such action by an assignee, than to secure one who has himself taken from the assignor such security to a large amount within such sixty days. The question before us is not whether the assignee was thereby induced to refrain from attacking any of such illegal mortgages or liens in order to preserve the mortgage given in part for his own benefit, but whether there was such an intent in making the assignment. Parties must be presumed to have intended the natural and probable result of their own conduct. That the assignor and assignee, in making the assignment, both expected and intended that the mortgages should be first paid out of the mortgaged property, and the balance only be distributed to the general creditors by the assignee, is manifest from the reference in the assignment to the inventory verified and certified by them, in which the amount of the chattel mortgages was deducted from the valuation of the personal property there given, and the amount of the real estate mortgages from the valuation of the real estate there given. The inventory was an essential part of the assignment, and the latter must be construed in connection with it. *Bates v. Simmons,* 62 Wis. 77; *Haben v. Harshaw,* 59 Wis. 403.

By such references, and in the light of surrounding circumstances, the intent to preserve, perpetuate, and enforce

the mortgages is manifest.    In a sense, such mortgages were thereby imported into the assignment, which is to be construed in connection with them as one transaction. *Berry v. Cutts*, 42 Me. 445; *Perry v. Holden*, 22 Pick. 269; *Housatonic, B. & L. B. v. Martin*, 1 Met. 294.    It is not the case of a prior fraudulent security wholly independent of, and disconnected from, the assignment.    The question is not as to any mistake in leaving property out of the inventory, but the intent thus expressed of having the illegal mortgages thus paid.    Such intent manifestly was to hinder, delay, and defraud the general creditors, and to secure illegal preferences to such secured creditors.    This is strengthened by the admission of the assignor under oath to the effect that the amounts stated as due to his son, Ferdinand, his son-in-law, Werner, and some others, as appeared in the verified list of creditors, were each largely fictitious.    Besides, he squarely admitted that he made the assignment so as to get a compromise with his creditors,— in order that the assignee should settle with them.

Upon the whole record we must hold that (1) where, as here, an insolvent debtor, within sixty days prior to his making an assignment, and in contemplation thereof or of his insolvency, gives mortgages or other securities upon pre-existing debts, to creditors then having a reasonable cause to believe him insolvent, and then makes such assignment to one of such secured creditors, and therein recognizes such mortgages and other securities as valid, subsisting liens, the assignment must be regarded as made with the intention of giving a preference to such secured creditors, and thereby to hinder, delay, and defraud general creditors; (2) especially as some of such secured claims, and others in the list of creditors, are wholly or in part fictitious, and the assignment is made with the confessed purpose of forcing a compromise with creditors.    The view taken renders it unnecessary to consider the sufficiency of the bond, or

what occurred subsequently to the making of the assignment.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for further proceedings according to law.